* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Ledford and the briefs and arguments of the parties. The appealing party has not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission adopts the Opinion and Award of Deputy Commissioner Ledford with minor modifications.
 * * * * * * * * * * *
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act. *Page 2 
2. At all relevant times in 2005, plaintiff was an employee of defendant.
3. Defendant is self-insured. The adjusting agent is Sedgwick Claims Management Services.
4. Plaintiff's average weekly wage is $715.70, which yields a compensation rate of $477.16.
5. Plaintiff alleges that beginning in about March 2005 he contracted the compensable occupational diseases of soft tissue (muscles, tendons, nerves, ligaments) inflammation, myofascial pain syndrome, bursitis, myalgia, arthralgia syndrome and joint pain in his elbows, shoulders, upper back muscle area between his shoulder blades, and muscular neck pain, arising out of and in the course of his employment by defendant. Defendant denies plaintiff's allegations.
6. Plaintiff last worked for defendant on June 14, 2005.
7. Defendant has paid plaintiff's short-term disability benefits in the period since June 14, 2005 for which defendant is entitled to a credit under N.C. Gen. Stat. § 97-42 against any award of benefits.
8. A package of documents marked as Stipulated Exhibit 1, was received as evidence, which included the following:
 a. Exhibit 1 — Contingency Fee Agreement
 b. Exhibit 2 — Industrial Commission Forms
 c. Exhibit 3 — Plaintiff's Medical Records for the period of time from February 8, 2005 through November 16, 2005
 d. Exhibit 4 — Plaintiff's Physical Therapy Records
 * * * * * * * * * * * *Page 3 
Based upon all of the competent evidence of record and reasonable inferences flowing therefrom, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was 49 years old with a high school education. Prior to working for defendant, plaintiff was employed as a factory laborer with Black Decker (1983-1984), Burlington Industries (1984-1986), Klaussner Furniture Industries (1986-1990), and Best Foods (1990-1993). In 1993, plaintiff was hired by defendant and continued to work for defendant exclusively with the exception of a six-month employment with Biscuitville in 1995.
2. In 2002, plaintiff began working as a modular plug machine operator. Initially, plaintiff worked exclusively on the 0-2 machine. In November 2004, he began to cross train on the 0-0 machine. The set-up process for both machines was essentially the same, requiring the operator to take apart the machine, clean and spray the parts, and then reassemble it prior to beginning production. The production process for both machines required similar motions with the arms and shoulders for both machines. The difference between the machines was that while the 0-2 machine produced only one part during each shift, the 0-0 machine produced several different parts during each shift. Therefore, when working on the 0-0 machine, plaintiff would have to perform the "set-up" process listed above between three and four times a shift as opposed to just once per shift while working on the 0-2 machine. Plaintiff testified that on the 0-0 machine the motions with his arms and shoulders were basically the same, but that he made the motions more often.
3. Plaintiff testified that his pain in his shoulders, back and/or arms did not begin until February 2005, after he began working on the 0-0 machine, and that he had never had any *Page 4 
problems with his shoulders, back and/or arms prior to February 2005. However, this testimony is contradicted by his medical records, which show he sought medical treatment for left arm and shoulder pain as early as 2001.
4. Ms. Kelly A. Dixon had been employed by defendant for 20 years and was plaintiff's supervisor. Ms. Dixon testified that generally speaking, the duties of a modular plug machine operator involved placing housings into a hopper and hanging reels of gold terminals, which the machine would then assemble together. After the machine assembled the parts, the machine operator would then inspect and pack them for shipping. This process is the same for each machine and for each part produced.
5. In her role as supervisor, Ms. Dixon would walk the floor each shift to make sure that her employees were doing okay. During one such walk, plaintiff informed Ms. Dixon that his shoulders "were real sore." When asked why he was sore, plaintiff initially responded that he did not know why he was sore, but, during their third conversation regarding the issue, plaintiff mentioned that it might be a reemergence of his Hodgkin's Lymphoma, a cancer plaintiff had been diagnosed with in the 1990s. Ms. Dixon asked plaintiff on two separate occasions if he wished to transfer to another position, but plaintiff declined each time. At no time did plaintiff ever relate his pain to any of his employment duties with defendant.
6. Ms. Rene Williams was a registered nurse working for Nurse Aid and was hired by defendant on an independent contract basis to serve as defendant's workers' compensation medical case manager. In addition to serving as a workers' compensation case manager, Ms. Williams's duties included on-site first aid care and training and treatment of injured or ill employees. During her tenure as plant nurse, no employee had ever filed a workers' *Page 5 
compensation claim arising from his or her duties as a modular plug assembly operator on the 0-2 machine.
7. At some time prior to June 27, 2005, plaintiff informed Ms. Williams that he was having problems with his arms and shoulders but that he did not know what was causing his problems. At no time during her multiple conversations with plaintiff after he was removed from work, did plaintiff ever report that his condition was improving or changing in any manner.
8. In February 2005, plaintiff noticed pain in the left shoulder joint and presented to physician's assistant Mr. Andy Seacrest. Physical examination revealed tenderness in the left subacromial space and decreased range of motion secondary to pain along with tenderness in the left trapezius. Mr. Seacrest diagnosed plaintiff with subacromial bursitis and plaintiff received a subacromial joint injection, which provided immediate relief.
9. On April 1, 2005, plaintiff returned to Mr. Seacrest, when he reported a two-week history of soreness in the neck, shoulders, and arms that hurts more at night. Mr. Seacrest diagnosed plaintiff with neck and shoulder pain and prescribed Flexeril. Plaintiff returned again on May 3, 2005, with complaints primarily of a one-month history of bilateral elbow pain. For the first time, plaintiff told Mr. Seacrest that his pain might be related to work. However, Mr. Seacrest did not remove plaintiff from work or impose any restrictions.
10. On May 17, 2005, plaintiff retuned to Mr. Seacrest, at which time plaintiff admitted that he had not received his regular testosterone shots in over one month. Mr. Seacrest resumed plaintiff's testosterone injections, and related his malaise and muscle aches to his testosterone deficiency. On June 1, 2005, due to continued complaints of bilateral shoulder and elbow pain, Mr. Seacrest referred plaintiff to orthopedic surgeon Dr. Michael King. *Page 6 
11. Dr. King first evaluated plaintiff on June 24, 2005, but did not review any of plaintiff's prior medical records. Dr. King diagnosed plaintiff with myofascial pain syndrome and myalgia/arthralgia syndrome in the upper extremities, upper back and upper chest. Based solely on plaintiff's subjective description of his duties with defendant, Dr. King opined that the diagnosed conditions were "secondary to his job as assembly machine operator at Tyco Corp" and he removed plaintiff from work for a period of three months, and planned to see plaintiff on a monthly basis.
12. Plaintiff returned to Dr. King on September 30, 2005. Plaintiff's complaints were the same and Dr. King further diagnosed plaintiff with bilateral lateral epicondylitis, bilateral biceps tendonitis, bilateral impingement syndrome and bilateral subacromial bursitis. Even though plaintiff had been off work for three months, the notes indicate his condition had not improved. Dr. King wrote plaintiff out of work for three more months, and referred plaintiff for a bone scan.
13. On October 13, 2005, plaintiff returned to Dr. King, who reviewed the results of plaintiff's bone scan and noted, "[B]one scan report shows no increased uptake, but this does not detract from the true diagnosis of the patient's pain." At plaintiff's October 28, 2005 visit, Dr. King noted, "no change on exam today. . . .No change in how he feels either. He still has the same level of pain." As of that date, plaintiff had been out of work for a period of approximately 4 months. Plaintiff's final visit with Dr. King was on November 16, 2005. On that date, Dr. King noted that plaintiff was doing "a little better with his elbows and shoulders" and opined that plaintiff should return to work with restrictions of no lifting, pushing, or pulling greater than one pound. Dr. King also recommended plaintiff be allowed to work as a modular plug assembler with defendant. *Page 7 
14. Plaintiff was also seen by orthopedic surgeon, Dr. Frank Rowan, on July 19, 2005, when plaintiff complained of an approximate one-month history of bilateral elbow, shoulder, and low back pain. According to plaintiff, such pain was constant and did not get any better over the weekend when plaintiff was not working. Plaintiff reported to Dr. Rowan that he was not sure whether his pain was work related but that Dr. King has said that he might have myofascial pain syndrome directly related to his job.
15. After conducting a physical examination of plaintiff and reviewing plaintiff's prior medical history, and plaintiff's job duties, Dr. Rowan opined that plaintiff's medical condition was not work related. At his deposition, Dr. Rowan opined that if plaintiff's medical condition was the result of his employment, he would expect that the symptoms would improve during the weekends when plaintiff was not working and during the month plaintiff was out of work between June 14, 2005 and the date Dr. Rowan examined plaintiff on July 19, 2005. In fact, the medical records from Dr. King's treatment reveal that plaintiff did not show improvement until November 2005 when Dr. King released him to return to work.
16. Furthermore, Dr. Rowan also pointed out that plaintiff presented with complaints of pain in multiple areas, which did not fit with an occupational disease claim of a repetitive motion injury or plaintiff's actual job duties. It was Dr. Rowan's opinion that plaintiff's medical condition was more likely than not caused by some factor other than work activities such as plaintiff's elevated rheumatoid factor (which was subsequently excluded by Dr. Thomas Rowe), plaintiff's age combined with his weight of around 380 pounds, or fatigue secondary to his congestive heart failure.
17. Dr. Kevin Speer, an orthopedic surgeon who specializes in upper extremities, reviewed plaintiff's relevant medical records dating back to 1999 and videotapes of both the *Page 8 
modular plug lines plaintiff had worked. In Dr. Speer's practice, he is routinely asked to review videotapes of job duties and provide an opinion as to whether such duties could be the cause of the patient's medical condition. Generally in reaching an opinion as to causation, Dr. Speer focuses on activities at or above shoulder level, repetitive overhead activities, and activities that require lifting, pushing, pulling with the elbows away from the body that involve a substantial weight or a substantial stress. With regard to the videotape of plaintiff's duties, Dr. Speer noted that while they show some repetitiveness of actions, the physical requirements of plaintiff's position were not sufficient to place plaintiff at a greater risk of developing a repetitive or occupational shoulder injury, disease, or condition beyond that which might be experienced by anyone in the general public. Furthermore, from a review of plaintiff's medical reports, Dr. Speer noted that plaintiff has poor exercise tolerance and overall poor health and stamina. Dr. Speer further opined that the fact plaintiff continued to have pain six months after being removed from work provides validity to his opinion that plaintiff's condition was unrelated to his employment.
18. Although plaintiff denied any pre-existing problems with his arms and shoulders, plaintiff's prior medical reports reveal that in July of 2001, plaintiff presented to Dr. Herber, with Kernersville Family Practice, at which time he reported that he was having pain in the super clavicle area and left shoulder interior joint. In October of 2002, plaintiff saw physician's assistant Andy Seacrest, complaining of left arm and shoulder pain that had been going on for months. Also in October of 2002, plaintiff saw his cardiologist, Dr. Renaldo, reporting that he had neck and bilateral arm discomfort all the time. On November 15, 2002, plaintiff saw Dr. Jorge Calles-Escandon, of Wake Forest University Baptist Medical Center, with multiple complaints including joint pain, stiffness and swelling, muscle pain and back pain. *Page 9 
19. While Dr. King opined to a reasonable degree of medical certainty that plaintiff's conditions were made worse as a result of his job duties when compared to members of the general public not equally exposed and that plaintiff was placed at an increased risk of developing these conditions due to his job duties, these opinions were based solely upon a subjective description of plaintiff's job duties provided by plaintiff to Dr. King. There is no evidence of what plaintiff actually described to Dr. King in terms of his job duties.
20. Having considered the testimony of Drs. Rowan, King and Speer, along with their relative experience, expertise and training, as well as the foundation for their opinions, the undersigned give greater weight to the testimony of Drs. Speer and Rowan. The greater weight of the medical evidence fails to establish any causal connection between plaintiff's duties of his employment with his complaints of pain in multiple parts of his upper body, including his upper back, shoulders, neck and extremities and his diagnoses of myofascial pain syndrome, myalgia/arthralgia, lateral epicondylitis, tendonitis, bilateral impingement syndrome, and bursitis. The evidence does not establish that plaintiff's employment placed him at increased risk for developing any of the multiple conditions plaintiff alleges, or that the same were caused by his employment.
 * * * * * * * * * * *
Based upon the foregoing stipulations and findings of fact, the Full Commission reaches the following:
 CONCLUSIONS OF LAW
1. In order for the Commission to find a compensable occupational disease, pursuant to N.C. Gen. Stat. §97-53(13), it must be shown that the claimant suffers from a condition "(1) characteristic of persons engaged in the particular trade or occupation in which the claimant is *Page 10 
engaged; (2) not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there must be a `causal connection between the disease and the [claimant's] employment.'" Rutledge v. TultexCorp., 308 N.C. 85, 93, (1983); See also, Futrell v.Resinall Corp., 151 N.C. App. 456, (2002) (aff'd357 N.C. 158). The first two elements of this three-pronged test are satisfied where the employee can show that the employment exposed [him] to a greater risk of contracting the disease than the public generally.Rutledge, 308 N.C. at 94, (emphasis added). The North Carolina Supreme Court has stated that when determining whether occupational exposure played a role in the development of a disease, the Commission should also examine certain other factors in additional to expert medical testimony such as "(1) the nature and extent of claimant's occupational exposure, (2) the presence or absence of other non-work-related exposures and components which contributed to the disease's development, and (3) correlations between claimant's work history and the development of the disease."Rutledge, 308 N.C. at 105.
2. A plaintiff seeking to prove an occupational disease must show that the employment placed him at a greater risk for contracting the condition, even where the condition may have been aggravated but not originally caused by plaintiff's employment. Futrell v.Resinall Corp., 151 N.C. App. 456 (2002), aff'd percuriam, 357 N.C. 158, (2003). Accordingly, plaintiff has failed to prove that he accelerated or aggravated a preexisting condition in his employment with defendant. N.C. Gen. Stat. § 97-53(13)
3. Plaintiff has failed to prove that he sustained a compensable occupational disease arising out of his employment with defendant. N.C. Gen. Stat. § 97-53(13).
 * * * * * * * * * * * *Page 11 
Based upon the foregoing findings of fact and conclusions of law, the undersigned enter the following:
 AWARD
1. Plaintiff's claim for benefits for his alleged occupational disease claim must be, and is hereby DENIED.
2. Each side shall bear their own costs, except that defendants shall pay all expert witness fees approved.
This the 29th day of November, 2007.
S/_____________________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
S/_____________________ BERNADINE S. BALLANCE COMMISSIONER
S/_____________________ DANNY LEE MCDONALD COMMISSIONER *Page 1